UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Robert Haberern,<br>  *Plaintiff*,<br><br>  *v.*<br><br>Goodrich Pump & Engine Control Systems, Inc.,<br>  *Defendant*. | Civil No. 3:07cv1180 (JBA)<br><br><br><br>January 15, 2009 |
|---|---|

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this diversity case, Plaintiff Robert Haberern has sued his former employer, Goodrich Pump & Engine Control Systems, Inc. ("Goodrich") alleging wrongful termination, unfair trade practices, negligence, and willful denial of pension benefits. Before the Court is Goodrich's motion for summary judgment as to all counts and its motion to strike certain parts of Plaintiff's Local Rule 56(a)2 statement. Because no jury could find in Plaintiff's favor on any of his claims, the Court grants Goodrich's summary-judgment motion.

**I. Factual Background**

Goodrich, a manufacturer of aircraft components, hired Haberern as a quality engineer in 2002. Haberern was employed on an at-will basis and was supervised by Tony Franco, a quality engineering supervisor. During his employment, Haberern's basic duties were to analyze Goodrich's manufacturing processes for errors and to help meet customer specifications. Central to this case are Goodrich's internal protocols, under which an employee can issue a Corrective Action Report ("CAR") to address a problem that he or she believes needs to be corrected. The CAR is first directed at the person responsible for the problem; if not adequately resolved, management personnel then become involved as

necessary.

Beginning in 2003, Haberern noticed certain missing data in a computer database comprised of inspection records. Even though Haberern notified his superiors, when the problem was not completely resolved by September 2004, he issued a CAR seeking to reduce these errors in the database fields. He initiated two additional CARs in February and November 2005 with the same complaint, but remained unsatisfied with the responses he received from his superiors. Goodrich hired a new quality director, Robert Feller, in February 2006, who took charge of Haberern's complaints about the inspection database and proposed several solutions to address Haberern's still-pending third CAR, including ordering an internal audit of the database. David Parmelee, the internal auditor, investigated the inspection records and concluded that although not all of the information from the records had been transferred to the database, the actual records themselves were "adequate" and remained in company archives. (Parmelee Aff. ¶¶ 5–9.)

Haberern continued to find the company's response insufficient because he thought that Feller had not addressed the "root cause" and had not provided a timetable for correcting the database. Feller disagreed, and asked Douglas Werner, Goodrich's system administrator, to close out the CAR. Werner then closed the CAR as directed, using Haberern's electronic signature as authorization. This only further upset Haberern, who believed the misuse of his electronic signature had been intentional, even though Werner avers that it was merely an error and that Feller ordered it changed soon thereafter (Werner Aff. ¶¶ 6–10).

Meanwhile, Haberern spoke with Franco about his dissatisfaction with the whole matter. Franco then raised the issue with Michael Petti, a vice president in human resources,

who in turn spoke with Feller, prompting Werner to correct the CAR to reflect that Feller, not Haberern, authorized the closure.  Petti conveyed to Haberern that his electronic signature had been used only by mistake, and Petti further asked Haberern to meet directly with Feller to resolve the problem.  Haberern e-mailed Petti explaining why he was opposed to meeting with Feller and also citing his rights to alternative relief under the company's code of conduct.  On November 8, 2006, Petti instructed Haberern to attend a meeting with him and Feller to address the CAR and cautioned Haberern that refusing to attend would constitute insubordination.  Haberern nevertheless refused, and so Petti suspended him.

Petti followed up by calling Haberern later that week and asking him to return to work.  In his deposition, Haberern described his eventual return on November 14, 2006 as follows:

> Q. . . . So, did you wait for Mr. Petti in the lobby?
>
> A. Yes. Yes. He came in, and I was pretty upset, you know. I just said, you know, how does the victim of a crime get suspended? And Mr. Petti, he was sitting at . . . his desk. At that time, he got up and he kind of came toward me and said, what crime? I said, the crime of using my signature. And kind of, you know, he seemed . . . pretty angry. I don't think Mike would do any physical harm but you never know. I kind of faced him, just, you know, kept my distance. . . .
>
> Q. Okay. Do you remember anything else that was said at that meeting with Mr. Petti and [human resources manager] Jocelyn Feder?
>
> A. Yeah. Mr. Petti said the meeting was going to happen and I said something to the, you know, I don't remember the exact words, but I wasn't going to attend the meeting, and he said, if you don't attend, there will be consequences that you don't want to deal with. And at that point, I left. . . .
>
> Q. Was there some reason why you didn't want to meet with Mr. Feller at that point?

3

>   A.   It was pointless, and I thought Mike [Petti] was just trying to get it blown over at a company level, and I wasn't comfortable with that.
>
>   Q.   What did you want to happen at that point?
>
>   A.   I wanted Mike to come back with a corrective action for using my signature. Anybody using somebody's signature is pretty important, you know. It shouldn't happen.

(Haberern Dep. at 137:12–23, 138:11–19, 139:13–23.) That same day, Petti sent Haberern a letter notifying him that his employment was terminated, and specifically cited Haberern's insubordination on November 8 and 14. Haberern later contacted the company's ethics department, which upon review upheld the termination decision.

Haberern filed this action against Goodrich in August 2007, alleging five counts under Connecticut law: (1) wrongful termination in violation of public policy, (2) forgery in violation of the Connecticut Unfair Trade Practices Act, (3) negligent forgery of his signature, (4) negligent hiring and/or supervision, and (5) failure to pay pension benefits pursuant to Connecticut General Statutes § 31-72. During the pre-filing conference on Goodrich's anticipated motion for summary judgment, Plaintiff's counsel abandoned the claim for pension benefits in count five. In briefing and at oral argument, his attorneys also did not oppose summary judgment on the claims in counts two, three, and four.[1] The sole

---

[1] The Court also concludes that Goodrich's arguments for summary judgment on counts two through four are meritorious. Count two fails because CUTPA does not apply in an at-will employment relationship. *Quimby v. Kimberly Clark Corp.*, 613 A.2d 838, 844–45 (Conn. App. Ct. 1992). Count three fails because forgery must be more than a negligent act. *Cook v. Bieluch*, 629 A.2d 1175, 1183 (Conn. App. Ct. 1993). And count four fails because there is a complete absence of record evidence supporting a claim of negligent hiring or supervision.

remaining claim, then, is that Haberern was wrongfully terminated in violation of public policy.

## II. Wrongful Termination

### A. Legal Principles[2]

Connecticut law has recognized the tort of wrongful termination in violation of public policy since *Sheets v. Teddy's Frosted Foods, Inc.*, 427 A.2d 385, 389 (Conn. 1980). With this, the Connecticut Supreme Court provided "a public policy limitation on the traditional employment at-will doctrine in an effort to balance the competing interests of employers and employees." *Daley v. Aetna Life and Casualty Co.*, 734 A.2d 112, 131 (Conn. 1999). As the high court explained more recently:

> [W]e repeatedly have underscored our adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employee relationship is a narrow one. Consequently, we have rejected claims of wrongful discharge that have not been predicated upon an employer's violation of an important and clearly articulated public policy. In each such instance, we found no statutorily based expression of public policy sufficient to warrant an exception to the at-will employment doctrine.

*Thibodeau v. Design Group One Architects, LLC*, 802 A.2d 731, 737–38 (Conn. 2002) (quotation marks and citations omitted).

Acknowledging that the recognition of such a public policy can be difficult, the court directed that, "[i]n evaluating claims, [courts must] look to see whether the plaintiff has alleged that his discharge violated any explicit statutory or constitutional provision[,] or whether he alleged that his dismissal contravened any judicially conceived notion of public

---

[2] The well-known summary-judgment standard is familiar to the parties and the Court, and it will not be recited again here. *See Sanabria v. Martins*, 568 F. Supp. 2d 220, 221 (D. Conn. 2008).

policy." *Faulkner v. United Techs. Corp.*, 693 A.2d 293, 295 (Conn. 1997) (quotation marks omitted). *Faulkner* further held that a public policy giving rise to the claim can be expressed in a federal statute such as the Major Frauds Act, 18 U.S.C. § 1031. *Id.* at 297. But courts should take care not to "impute a statement of public policy beyond that which is represented" in statutory language. *Daley*, 734 A.2d at 134 (noting the limitations of state and federal protections for medical and family leave). And, importantly, an employee cannot challenge his termination "based on a *subjective* belief" that his employer's actions implicated an overriding public-policy concern; he must carry the burden of *proving* that his discharge was in fact contrary to an identified public policy. *Parsons v. United Techs. Corp.*, 700 A.2d 655, 666 (Conn. 1997).

**B.    Analysis**

Haberern claims that he was wrongfully terminated in violation of the public policy which promotes public safety, particularly in relation to aircraft equipment. In light of the guidance from the Connecticut Supreme Court, however, it is apparent that Plaintiff's claim suffers from two flaws: (1) he has cited no statute, constitutional provision, or judicial opinion as a source for a specific public policy; and (2) there is no evidence in the record which shows that the generalized issue of public safety was ever implicated by the events leading to his termination.

First, Haberern cannot proceed with a claim of wrongful discharge without pointing to a specific expression of the public policy on which he relies. *Morris v. Hartford Courant Co.*, 513 A.2d 66, 68 (Conn. 1986). Looking to count one of his complaint, Plaintiff alleges:

> 22.    The Defendant's actions constitute wrongful termination in violation of public policy. Established public policy aims to protect individuals operating and being transported in aircraft and other vehicles

>> manufactured by the Defendant.
>
> 23. Accordingly, the Defendant's termination of the Plaintiff as a result of his refusal to sign-off on an incomplete Corrective Action Report (a report which directly related to the safety of individuals coming into contact with the Defendant's products) and/or his objection to the fraudulent conduct of his coworker constitutes wrongful termination.

(Compl. ¶¶ 22–23.) In his opposition memorandum, Haberern elaborates on the public policy implicated by his claim:

> Here, Plaintiff refused to sign off with his electronic signature on incomplete product inspection records required by Defendant's own policies, FAA and state and/or federal law, as well as AS 9100, which is an internationally recognized quality and safety certification system used throughout the airline industry. Failure to complete inspections could result in the safety of Defendant's products being compromised. . . . Plaintiff's position is that the important public policy of public safety is implicated by Defendant's conduct.

(Pl.'s Opp'n at 2–3.)

These generalized references to internal policies, state and federal law, and industry standards are insufficient. A claim of wrongful discharge must be "predicated on an employer's violation of an important and clearly articulated public policy," *Thibodeau*, 802 A.2d at 737, not merely a passing and unsupported invocation of unspecified legal provisions. The only specific citation—the "AS 9100" international standard—is to a set of accepted *industry* policies, which is not the same thing as being a source of *public* policy. By the aerospace industry's own description, the forward to the version of the AS 9100 standard furnished by the Plaintiff indicates that the drafters were concerned with "customer satisfaction" and "reductions in cost, throughout the value stream" just as they were mindful of "achieving significant improvements in quality and safety." (Pl.'s Ex. 8 at 2.) Even

granting that the standard reflects in part a concern for the public safety shared by state and federal political bodies, Haberern has not shown how the AS 9100 requirements directed at records management bear on the events leading to his termination of employment. Haberern's references to the standard are merely in passing and lack specificity, and the copy attached to his briefing is but a short excerpt of the full document. Without more, he has not demonstrated that the standard is a valid source of public policy which can support a claim of wrongful discharge. *See Faulkner*, 693 A.2d at 295 (limiting recognized sources of public policy to statutes, constitutional provisions, and judicial opinions). Thus, with no such source identified, it is impossible to determine whether Haberern's supervisors at Goodrich acted in a way which violated any particular expression of public policy.

Second, even assuming that there is a source for the public policy claimed (such as the international standard), the evidentiary record does not support the conclusion that Haberern's termination was contrary to principles directed at ensuring public safety. There was no evidence that Haberern was fired for insisting that his employer comply with the law, *Sheets*, 427 A.2d at 389, for refusing to participate in unlawful activities, *Faulkner*, 693 A.2d at 296, or in retaliation for demanding a safe workplace, *Parsons*, 700 A.2d at 663. Other than Haberern's own subjective belief that the incomplete database reflected a safety risk, the only meaningful mention of safety issues in the record is in Franco's deposition, where he abstractly discussed the relationship between quality control and product safety. (Franco Dep. at 57:10–60:23.)[3] By Haberern's telling, the risk to public safety arose when Goodrich failed to correct the database errors that he reported in his CARs and from the improper use

---

[3] When pressed on this point at oral argument, Plaintiff's counsel did not direct the Court to any more specific evidence that there was a risk to public safety.

of Haberern's electronic signature as part of an effort to keep him from pursuing his complaints further.  Leaving aside the evidence establishing that the use of Haberern's signature was merely a mistake, this argument lacks merit principally because there is undisputed record evidence that the actual inspection reports existed in Goodrich archives, which means that the incomplete database represented no underlying inadequacies in product inspections.

Goodrich is in the business of manufacturing aircraft components, which necessarily implicates a risk to public safety in general terms.  The logical extension of Haberern's position is that because any dispute over internal company policy also places public safety theoretically at risk, Goodrich may face wrongful-discharge liability whenever it fires someone for disagreeing with or being insubordinate regarding its policies.  This breadth cannot be what the Connecticut Supreme Court intended when it recognized the claim of wrongful discharge as a "narrow" exception to the general rule concerning the nature of at-will employment.  *Thibodeau*, 802 A.2d at 737.  Thus, Haberern's evidentiary showing falls far short of providing a basis on which a jury could conclude that Goodrich's actions violated an "important and clearly articulated public policy."  For these reasons, summary judgment is appropriate.

### III.    Conclusion

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 16] is granted. Defendant's Motion to Strike [Doc. # 24] is denied for the reasons stated at oral argument.[4] The Clerk is directed to close this case.

IT IS SO ORDERED.

        /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 15th day of January, 2009.

---

[4] The Court continues to adhere to its previously expressed belief that motions to strike directed at Local Rule 56(a) statements are improper given that "neither the text of Rule 56 nor of Rule 12(f) authorizes use of motions to strike for [this] purpose." *Dragon v. I.C. Sys., Inc.*, 241 F.R.D. 424, 425–26 (D. Conn. 2007) (noting that "summary judgment *briefing*" is the more "appropriate and adequate" avenue for raising challenges to the Rule 56 record).  The submissions required by Local Rule 56(a) serve to aid, not substitute for, the Court's independent review of the underlying record.  Even if a party's statement of facts fails to reflect the actual evidentiary record, the best course is to respond to such deficiencies in the briefing on the motion for summary judgment.